1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JESUS MURIETA,

                Petitioner,

     v.

JOE A. LIZARRAGA, Acting
Warden,

              Respondent.

NO. CV 12-10917 SS

**MEMORANDUM DECISION AND ORDER**

**I.**

**INTRODUCTION**

On December 18, 2012,[1] Jesus Murieta ("Petitioner"), a California state prisoner proceeding pro se, constructively filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.[2]  On December 24, 2012, Petitioner consented to the jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), and on March 8, 2013, Respondent consented as well.  Respondent filed an Answer to the Petition (the "Answer") and a Memorandum of Points and Authorities in Support Thereof on March 13, 2013.  Respondent lodged eight documents from Petitioner's trial proceedings in Los Angeles County Superior Court, including a one-volume copy of the Clerk's Transcript ("CT"), a five-volume copy of the Reporter's Transcript ("RT"), and a one-volume supplement to the Reporter's Transcript ("RT Supp.").  For the reasons discussed below, the Petition is DENIED and this action is DISMISSED with prejudice.

\\

---

[1]   Under the "mailbox rule," a pleading filed by a pro se prisoner is deemed to be filed as of the date the prisoner delivered it to prison authorities for mailing, not the date on which the pleading may have been received by the court.  Houston v. Lack, 487 U.S. 266, 270, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988); Anthony v. Cambra, 236 F.3d 568, 574-75 (9th Cir. 2000). Here, the Court has calculated the filing date of the Petition pursuant to the mailbox rule as the date the Petition was signed, December 18, 2012.  (Petition at 6) (The Court refers to the pages of the Petition as if they were consecutively paginated).

[2]   Joe A. Lizarraga, Acting Warden of Mule Creek State Prison, where Petitioner is currently incarcerated, is substituted for Warden Knipp, whom Petitioner originally named in the Petition. See Fed. R. Civ. P. 25(d).

## II.

### PRIOR PROCEEDINGS

On September 3, 2010, a Los Angeles County Superior Court jury found Petitioner guilty of one count of second degree murder in violation of California Penal Code ("Penal Code") § 187(a). (CT 179-81). The jury also found true the allegation that Petitioner personally used a deadly weapon to commit the murder within the meaning of Penal Code § 12022(b)(1). (Id.). On November 22, 2010, the trial court sentenced Petitioner to a total term of sixteen years to life in state prison. (Id. at 201-02; RT 3607).

On April 12, 2012, the California Court of Appeal affirmed the trial court's judgment. (Lodgment 6, Opinion of the California Court of Appeal, at 1 ("Lodgment 6")). Petitioner sought review in the California Supreme Court, (Lodgment 7, Petition for Review ("Lodgment 7")), and the state supreme court summarily denied his Petition for Review on June 20, 2012. (Lodgment 8, California Supreme Court Docket ("Lodgment 8")). Having presented his arguments on direct appeal, Petitioner did not seek collateral review in the state courts. Petitioner filed the instant Petition on December 24, 2012.

\\
\\
\\
\\
\\

3

### III.

### FACTUAL BACKGROUND

The following facts, taken from the California Court of Appeal's written decision on direct review, have not been rebutted with clear and convincing evidence and must therefore be presumed correct.   28 U.S.C. § 2254(e)(1); Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

On April 7, 2008, at approximately 6:00 p.m., Leo Cervantes went to Zapopan Park, where a group of homeless people, including [Petitioner] (known as Chalino) and Leticia Sanchez, sometimes hung out. According to a confidential informant, Cervantes asked [Petitioner], who was drunk, if he had any weed. Offended, [Petitioner] said he didn't sell anything. Cervantes apologized and asked someone else for weed. Still angry, [Petitioner] asked Cervantes what his problem was and if he wanted "beef," to fight.   Sanchez told [Petitioner] to sit down, that Cervantes wasn't bothering him.   Cervantes told [Petitioner] he didn't want to fight.   [Petitioner], however, persisted, saying he was going to kick Cervantes' ass.

Removing a knife from a sheathe on his belt and saying he wanted a clean fight, [Petitioner] handed the knife to Sanchez and walked to Cervantes.   [Petitioner] swung at Cervantes.   When he missed, Cervantes hit

1    [Petitioner], knocking him to the ground. [Petitioner]

2    tried to get up, but Cervantes knocked him back down

3    and kicked him, repeating he didn't want to fight.

4    Sanchez kicked Cervantes and yelled at [Petitioner] to

5    get up, that he looked like he didn't know how to

6    fight.   Two men pulled Cervantes and [Petitioner]

7    apart, and Cervantes left.

8

9    [Petitioner] and Sanchez, knives in their hands,

10    followed him.  People told the confidential informant

11    that [Petitioner] and Sanchez split up to look for

12    Cervantes and that Sanchez bragged about "sticking"

13    him.

14

15    That same day, sometime after 7:00 p.m., Kimberly

16    Martinez was on Delta Avenue, near Zapopan Park.  While

17    putting her baby into a car, she noticed Cervantes walk

18    past her.  About a minute later, another man, whom

19    Martinez identified as [Petitioner] at trial, walked

20    quickly or ran by.  Martinez thought that [Petitioner]

21    might be intoxicated because he wasn't walking

22    straight.   [Petitioner] caught up to Cervantes and

23    pushed him off the sidewalk, saying something to

24    Cervantes while doing so.   [Petitioner] punched

25    Cervantes, and they fought.  [Petitioner] pulled

26    something out and made a flipping motion, and Cervantes

27    grabbed [Petitioner]'s hand.  Although Martinez did not

28    see a knife, [Petitioner] made a stabbing motion at

1    Cervantes' side and chest.  [Petitioner] fell and hit

2    his head, and Cervantes kicked him once.  Cervantes

3    looked like he was in pain.

4

5    Sanchez, carrying a black purse, walked quickly by

6    Martinez, saying, "'Stop fighting, stop fighting.'"

7    When Sanchez couldn't get [Petitioner] up, she pulled

8    on Cervantes as if trying to hold him, and she

9    "'started kind of hitting him.'"  Martinez did not see

10   Sanchez make a stabbing motion toward Cervantes.  Hurt,

11   Cervantes broke away and walked to a house across the

12   street.  He died from a single stab wound to the chest.

13   Cervantes had only the one stab wound, and he did not

14   have wounds or cuts or bruises on his hands.

15

16   Los Angeles County Deputy Sheriff Ricky Gutierrez

17   received an emergency call at 7:20 p.m. and he went to

18   the intersection of Delta and Garvey.  On the way to

19   the location, he saw a Latino man kneeling on the

20   sidewalk and a Latina woman with long, pulled back hair

21   helping him up.

22

23   Two days later, on April 9, 2008, Sergeant Robert

24   Chivas with the Los Angeles County Sheriff's Department

25   found [Petitioner] and Sanchez near the 10 Freeway and

26   San Gabriel Boulevard in Rosemead.  [Petitioner] wore a

27   belt with two knife sheaths attached to it.  Folding

28   knives, one with a dark handle and dark blade and the

6

1 other with a dark handle and silver blade, were in each

2 of the sheaths.   [Petitioner] had a black eye, split

3 lip, and a fresh gash to the back of his head.   No

4 knives were on Sanchez or in a nearby black purse.

5

6 A DNA sample from a blood stain found at the crime

7 scene on Delta matched [Petitioner]'s DNA profile.   DNA

8 from blood on one of the knives found on [Petitioner]

9 when he was arrested matched Cervantes' DNA profile.

10

11 (Lodgment 6 at 2-4) (footnotes omitted).

12

13          **IV.**

14       **PETITIONER'S CLAIMS**

15

16  Petitioner presents two grounds for relief.   First, he

17 claims that the trial court violated his constitutional right to

18 due process by declining to issue a "sudden quarrel/heat of

19 passion" jury instruction – that is, to instruct the jury on the

20 lesser included offense of voluntary manslaughter.   (Petition at

21 4).

22 \\

23 \\

24 \\

25 \\

26 \\

27 \\

28 \\

1   Second, Petitioner alleges that Penal Code § 22(b),[3] which barred
2   the jury from considering evidence of Petitioner's intoxication
3   for purposes other than assessing whether he acted with
4   deliberation and premeditation, violated his rights under the Due
5   Process and Equal Protection Clauses by preventing him from
6   presenting a defense. (See id.).

7

8                                     **V.**

9                          **STANDARD OF REVIEW**

10

11      The Antiterrorism and Effective Death Penalty Act of 1996,
12  Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), applies to the
13  instant Petition because it was filed after AEDPA's effective
14  date of April 24, 1996. Lindh v. Murphy, 521 U.S. 320, 336, 117
15  S. Ct. 2059, 138 L. Ed. 2d 481 (1997). "By its terms [AEDPA]
16  bars relitigation of any claim 'adjudicated on the merits' in
17  state court, subject only to the exceptions in §§ 2254(d)(1) and
18  (d)(2)." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784,
19  178 L. Ed. 2d 624 (2011).

20

21      Pursuant to 28 U.S.C. § 2254(d)(1) and (d)(2), a federal
22  court may grant habeas relief only if the state court
23  adjudication was contrary to, or an unreasonable application of,
24  clearly established federal law, or was based upon an
25  unreasonable determination of the facts. A decision is contrary

26  _____

27  [3]    Following Petitioner's trial, Penal Code § 22 was recodified
    as Penal Code § 29.4. See S.B. 1171, § 119, 2012 Cal. Stats, c.
    162.   However, to maintain consistency with the briefings, the
28  Court will use the statute's original citation.

to clearly established federal law if a state court "applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a relevant Supreme Court precedent but arrives at a different result." Moor v. Palmer, 603 F.3d 658, 664 (9th Cir. 2010) (citing Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). Alternatively, "[t]here is an 'unreasonable application' of clearly established federal law when a state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a prisoner's case." Briceno v. Scribner, 555 F.3d 1069, 1076 (9th Cir. 2009) (citing Williams, 529 U.S. at 412-13). "A state court decision can also involve an unreasonable application of clearly established precedent if the state court either unreasonably extends a legal principle from the [Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. (citing Williams, 529 U.S. at 407).

Where a state supreme court denies a habeas petition without comment or citation, a district court must "look through" the unexplained denial to the last reasoned state court judgment as the basis for the supreme court's decision. See, e.g., Ylst v. Nunnemaker, 501 U.S. 797, 804, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); Howard v. Clark, 608 F.3d 563, 569 (9th Cir. 2010). Here, the Court looks through the California Supreme Court's summary denial of Petitioner's claims to the California Court of

Appeal's reasoned decision. (Lodgment 6). With respect to Ground One, the California Court of Appeal determined that the trial court "correctly refused to instruct the jury on voluntary manslaughter because there was insufficient evidence of adequate provocation[.]" (Id. at 6). The appellate court also held that barring the defense of voluntary intoxication did not violate Petitioner's federal or state constitutional rights. (Id. at 8-9). Accordingly, this decision was on the merits and AEDPA's deferential standard of review applies.

**VI.**

**DISCUSSION**

**A.** **Petitioner Is Not Entitled To Habeas Relief On His Claim That The Trial Court Erred By Failing To Instruct The Jury On Voluntary Manslaughter**

**1. The California Court Of Appeal's Decision**

In Ground One, Petitioner contends that the trial court violated his constitutional right to due process by declining to issue a "sudden quarrel/heat of passion" jury instruction – that is, to instruct the jury on the lesser included offense of voluntary manslaughter. (Petition at 4). The trial court declined defense counsel's request for a "heat of passion" instruction because it found there was not substantial evidence that Petitioner committed voluntary manslaughter. (RT 2119-20).

\\

1   The Court:   [I] would not – I would deny the request

2   for that instruction.  I don't think

3   that there is substantial evidence to

4   support it.   I don't think the

5   provocation, if any, was sufficient.

6

7   The way the case is portrayed is that

8   [Petitioner] was the aggressor . . .  He

9   became angry at something the victim

10  said and that's about it from what I've

11  heard.  The victim said something that

12  set him off and we have evidence of two

13  altercations, one earlier.  And secondly

14  that Miss Martinez witnessed.  So I

15  don't think that there is an evidentiary

16  basis for a voluntary manslaughter based

17  on provocation heat of passion.

18

19  (RT 2120-21).

20

21  The California Court of Appeal affirmed the trial court's

22  decision to not issue the voluntary manslaughter instruction.

23  First, the court set forth the law governing "heat of passion"

24  voluntary manslaughter in California:

25

26  Heat of passion arises when at the time of the killing,

27  the reason of the accused was obscured or disturbed by

28  passion to such an extent as would cause the ordinarily

reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment . . . . People v. Barton, 12 Cal. 4th 186, 201 (1995).  The provocation that incites the defendant to homicidal conduct must be caused by the victim or be conduct reasonably believed by the defendant to have been engaged in by the victim. People v. Manriquez, 37 Cal. 4th 547, 583 (2005).  It may be physical or verbal, but it must be sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Id.]; People v. Lee, 20 Cal. 4th 47, 59 (1999).  Thus, the heat of passion requirement has both an objective and a subjective component:  The defendant must actually, subjectively, kill under the heat of passion. [Citation].  But the circumstances giving rise to the heat of passion are also viewed objectively.  Manriquez, 37 Cal. 4th at 584; see also Lee, 20 Cal. 4th at 60 (the test of adequate provocation is an objective one).  A defendant may not set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable person.  Manriquez, 37 Cal. 4th at 584.  No specific type of provocation is required, and the passion aroused need not be anger or rage, but can be any violent, intense, high-wrought or enthusiastic

12

emotion other than revenge.   People v. Lasko, 23 Cal.
4th 101, 108 (2000).

(Lodgment 6 at 5-6) (internal quotation marks omitted).

Having set forth this legal framework, the court of appeal
concluded that the trial court correctly declined to instruct the
jury on voluntary manslaughter because "there was insufficient
evidence of adequate provocation to cause defendant to attack
Cervantes." (Id. at 6).   The court explained that provocative
conduct "may be physical or verbal, and it may comprise a single
incident or numerous incidents over a period of time[,] [b]ut the
type of verbal argument that might constitute adequate
provocation must be severe." (Id.) (internal citations omitted).
In this case, "[Petitioner] became enraged when Cervantes asked
if he had any marijuana for sale.   Asking someone if they sell
drugs may be insulting, but it is simply not the type of
provocation that would cause an ordinary person to act rashly or
without due deliberation and reflection." (Id. at 7).   Moreover,
it was Petitioner who attacked Cervantes first during their
initial encounter.

With respect to the second (and ultimately deadly) encounter
between Petitioner and Cervantes, the court of appeal found
"there [wa]s similarly insufficient evidence that Cervantes
either provoked [Petitioner] or that [Petitioner] was in an
uncontrollable rage.   Instead, Cervantes left the park, unwilling
to fight. [Petitioner] followed him, knife in hand.   When he

13

1  caught up to Cervantes, [Petitioner] pushed him.  They may or may

2  not have had a brief discussion.  The witness, Martinez, thought

3  that words were exchanged, but she didn't hear them.  There is,

4  however, no evidence that any words were exchanged in those brief

5  moments that could have obscured [Petitioner]'s reason."  (Id.).

6  Accordingly, the California Court of Appeal held there was no

7  basis on which to issue a voluntary manslaughter instruction at

8  Petitioner's trial.

9

10         **2.    The Court Of Appeal's Decision Was Not Contrary To, Or**

11              **An Unreasonable Application Of, Clearly Established**

12              **Federal Law**

13

14         No Supreme Court precedent squarely addresses the issue

15  underlying Petitioner's claim.  In capital cases, a trial court's

16  failure to issue a lesser included offense instruction sua sponte

17  is a constitutional error when there is evidence to support the

18  instruction.  Beck v. Alabama, 447 U.S. 625, 638, 100 S. Ct.

19  2382, 65 L. Ed. 2d 392 (1980); see also Solis v. Garcia, 219 F.3d

20  922, 929 (9th Cir. 2000) (noting that the Ninth Circuit has

21  declined to extend Beck to non-capital cases).  However, the

22  Supreme Court expressly left open the question of whether the Due

23  Process Clause requires such an instruction in non-capital cases

24  like the one currently before this Court.  See id. at 638 n.14.

25  Indeed, in previously rejecting a claim for habeas relief

26  identical to the one advanced in the instant Petition, courts

27  have recognized the lack of any Supreme Court precedent on this

28  issue.  See Castillo v. Clark, 610 F. Supp. 2d 1084, 1112-13

                              14

(C.D. Cal. 2009) ("To the extent that petitioner is claiming that he was unconstitutionally denied adequate instructions on the lesser included offense of voluntary manslaughter based on a theory of heat of passion, the Court notes preliminarily that the United States Supreme Court has never held that a defendant has a constitutional right to a jury instruction on a lesser offense in a non-capital case."). Absent a Supreme Court decision "squarely address[ing] the issue" in Petitioner's case, there was simply no "clearly established" federal law for the California courts to unreasonably apply or be contrary to. See Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (internal quotation marks and citations omitted). In such a case, the Court "must defer to the state court's decision." Id. Thus, Petitioner's claim must fail.

"Although only Supreme Court holdings are binding on state courts, [c]ircuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent." Dyer v. Hornbeck, 706 F.3d 1134, 1139 (9th Cir. 2013) (internal quotation marks and citations omitted). Furthermore, the Ninth Circuit has held that, when faced with a "novel situation," it "may turn to [its] own precedent, as well as the decisions of other federal courts, in order to determine whether [a] state decision violates the general principles enunciated by the Supreme Court and is thus contrary to clearly established federal law." Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

\\

1    However, even if the Court were to consider only Ninth Circuit

2    precedent to determine whether the California courts acted

3    contrary to, or unreasonably applied, clearly established federal

4    law, Petitioner's claim would still be without merit.

5

6        The Ninth Circuit has repeatedly held that a court's failure

7    to provide a jury instruction on a lesser included offenses in a

8    non-capital case is not a basis for federal habeas relief.  See,

9    e.g., United States v. Rivera-Alonzo, 584 F.3d 829, 835 n.3 (9th

10   Cir. 2009) ("In the context of a habeas corpus review of a state

11   court conviction, we have stated that there is no clearly

12   established federal constitutional right to lesser included

13   instructions in non-capital cases."); Windham v. Merkle, 163 F.3d

14   1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the

15   failure of a state trial court to instruct on lesser included

16   offenses in a non-capital case does not present a federal

17   constitutional question.").  The Court is aware of at least one

18   Ninth Circuit case suggesting that "the refusal by a court to

19   instruct a jury on lesser included offenses, when those offenses

20   are consistent with the defendant's theory of the case, may

21   constitute a cognizable habeas claim" where "substantial

22   evidence" supports the lesser offenses.  Solis, 219 F.3d at 929.

23   However, this case has since been cited for the proposition that

24   there is no clearly established federal right to a lesser offense

25   jury instruction in non-capital cases.  See Rivera-Alonzo, 584

26   F.3d at 835 n.3; see also Chaidez v. Knowles, 258 F. Supp. 2d

27   1069, 1096 n.15 (N.D. Cal. 2003) (questioning whether Solis's

28   suggestion is based on clearly established Supreme Court

16

1  precedent).   It   is   therefore   unclear   whether   Petitioner   has
2  stated a claim here for habeas relief.

3

4       Assuming <u>arguendo</u> that a state court's omission of a lesser
5  included offense instruction may rise to the level of a federal
6  constitutional   violation,   at   least   when   supported   by   the
7  evidence,   the   trial   court's   decision   to   not   issue   a   "heat   of
8  passion"   instruction   here   did   not   fall   within   this   exceptional
9  category   of   cases.   A   lesser   included   offense   instruction   may   be
10  issued   only   when   substantial   evidence   warrants   it.   <u>Solis</u>, 219
11  F.3d at 929; <u>Castillo</u>, 610 F. Supp. 2d at 1113; <u>cf.</u> <u>United States</u>
12  <u>v. Hernandez</u>, 476 F.3d 791, 798 (9th Cir. 2007) ("[T]o warrant a
13  lesser   included   offense   instruction,   the   evidence   at   trial   must
14  be   such   that   a   jury   could   rationally   find   the   defendant   guilty   of
15  the   lesser   offense,   yet   acquit   him   of   the   greater.")   (internal
16  quotation   marks   omitted).   In   this   case,   no   such   evidence   exists.

17

18       In   the   recording   of   the   confidential   informant's   (CI)
19  interview   with   police,   the   jury   heard   the   CI   state   that   he
20  witnessed Cervantes approach "the guy that stabbed him," known to
21  the   CI   as   Chalino,   and   ask   for   weed.   (CT   86-87,   100).   The   CI
22  said   that   Chalino   became   offended,   but   Cervantes   moved   on   and
23  asked   the   CI's   friend   for   weed.   (<u>Id.</u> at 100).   The   CI's   friend
24  told   Cervantes   "We   don't   have   anything   here."   (<u>Id.</u> at 100-01).
25  Meanwhile, Chalino went over to Cervantes and asked if he wanted
26  to   fight.   (<u>Id.</u> at 101).   Cervantes   said   he   did   not   want   to
27  fight, apologized for upsetting Chalino, and began backing away.
28  (<u>Id.</u> at 102-03, 123).   Chalino   responded   by   handing   his   knife   to

17

his girlfriend and walking up to Cervantes. (CT 102-03). A fist fight ensued and Cervantes knocked Chalino down. (Id. at 104-06). After the fight was broken up by two onlookers, Cervantes "turned around and walked away . . . away out of the park." (Id. at 108-09). The CI watched Chalino follow Cervantes out of the park with a switchblade. (Id. at 109-10). In sum, according to the CI's eyewitness account of the first encounter, Petitioner was not provoked into fighting Cervantes. Instead, Petitioner responded to a non-inflammatory question by insisting that Cervantes fight him, and, after Petitioner lost the fight, he pursued Cervantes with a knife.

The second eyewitness, Kimberly Martinez, testified that she saw Cervantes walk past her car while she was putting her baby into the car seat. (RT 1562-63). After she got into the car herself, she saw Petitioner "walking pretty fast" in the same direction as Cervantes. (Id. at 1563; see also id. at 1592 (identifying Petitioner as the man who followed Cervantes)). She said Cervantes was walking at a normal speed, but Petitioner was "walking fast, running." (RT 1564). Petitioner reached Cervantes and pushed him. (Id. at 1565-66, 1575). Martinez could see Cervantes' mouth open, like he was trying to tell Petitioner something, but she could not hear any words because the windows of her car were rolled up. (Id. at 1575). Martinez saw Petitioner start punching Cervantes. (Id. at 1576). When Cervantes hit back, Petitioner "pull[ed] something out." (Id. at 1567, 1576-77). Martinez testified that Cervantes appeared to try to hold the object in Petitioner's hand away from him, but

1   Cervantes let go and Petitioner made a stabbing motion.  (RT

2   1567, 1576-77).  Shortly thereafter, Martinez watched Cervantes

3   walk into a nearby house.  (Id. at 1586).  She stated that she

4   believed Cervantes was hurt based on how he was walking and the

5   fact that he kept lifting up his sweater and his shirt.  (Id.).

6

7       These eyewitness accounts established that Petitioner, not

8   Cervantes, initiated each violent encounter.  While the

9   witnesses' accounts of the incidents suggested that Cervantes

10  said something to Petitioner at the park and again on the street,

11  they did not establish, as Petitioner suggests, that Cervantes'

12  statements were so provocative that an ordinary person would have

13  responded with deadly violence.  See People v. Manriquez, 37 Cal.

14  4th 547, 583, 36 Cal. Rptr. 3d 340 (2005); People v. Lee, 20 Cal.

15  4th 47, 59, 82 Cal. Rptr. 2d 625 (1999).  Moreover, Petitioner

16  did not muster any rebuttal evidence to establish that Cervantes'

17  statements were sufficiently inflammatory to thrust a person of

18  ordinary passions into a fit of emotion-driven violence.  (See CT

19  126).  Absent such evidence, the trial court was not

20  constitutionally obligated to issue a voluntary manslaughter

21  instruction based on heat of passion.  See Solis, 219 F.3d at 929

22  ("[B]ecause there was no substantial evidence to support either

23  [manslaughter] charge," the state trial court did not err by

24  declining to issue manslaughter instructions).

25

26      Finally, even if Petitioner could show that the trial

27  court's failure to issue a voluntary manslaughter instruction

28  violated due process, he is not entitled to habeas relief because

this error had no "substantial and injurious effect on the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 353 (1993); Chaidez, 258 F. Supp. 2d at 1096 (applying Brecht to habeas claim based on trial court's failure to issue a lesser included offense jury instruction). As discussed above, there was no evidence suggesting that Petitioner's attack on Cervantes occurred in the heat of objectively sufficient and subjectively real passion. Instead, the evidence established that Petitioner initially responded to Cervantes' non-inflammatory question and subsequent apology with violence and, later on, methodically tracked down Cervantes and stabbed him to death. (CT 86-87, 100, 101-06, 108-10, 123; RT 1563, 1567, 1576-77). In sum, there was no evidence (much less substantial evidence) from which a jury could have found that Petitioner killed Cervantes in the heat of passion, and the Court cannot conclude that a voluntary manslaughter instruction, by itself, would have convinced the jury otherwise. Accordingly, the trial court's omission of this instruction was harmless error, and Petitioner is not entitled to federal habeas relief on Ground One.

\\
\\
\\
\\
\\
\\
\\
\\

1  **B.    Petitioner Is Not Entitled To Habeas Relief On His Claim**

2  **That Penal Code § 22(b) Violates The Due Process And Equal**

3  **Protection Clauses**

4

5        1.    **The California Court Of Appeal's Decision**

6

7        In Ground Two, Petitioner contends that the trial court,

8  pursuant to Penal Code § 22(b), unconstitutionally limited the

9  purposes for which the jury could consider evidence of

10 Petitioner's voluntary intoxication. (Petition at 4).

11 Petitioner argues that the jury should have been permitted to

12 consider evidence of his intoxication to determine not only

13 whether Petitioner acted with "express malice" (i.e.,

14 premeditation and deliberation), but also whether he acted with

15 "implied malice" (that is, conscious disregard for human life and

16 knowledge that his conduct endangered human life). (Id.); see

17 also People v. Sarun Chun, 45 Cal. 4th 1172, 1181, 91 Cal. Rptr.

18 3d 106 (2009) (defining express and implied malice). He also

19 asserts that by limiting the jury's consideration of his

20 intoxication, Penal Code § 22(b) "violated [his] federal due

21 process right to present a defense" and accorded "disparate

22 treatment of similarly situated second degree murderers" in

23 violation of the Equal Protection Clause. (Petition at 4).

24

25    Penal Code § 22(b) provides that "[e]vidence of voluntary

26 intoxication is admissible solely on the issue of whether or not

27 the defendant actually formed a required specific intent, or,

28 when charged with murder, whether the defendant premeditated,

deliberated, or harbored express malice aforethought." Consistent with Penal Code § 22(b), the trial court instructed the jury as follows:

> You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may also consider that evidence in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation . . . . You may not consider evidence of voluntary intoxication for any other purpose except as set forth in these instructions.

(CT 171).

On direct review, the California Court of Appeal affirmed the trial court's decision to issue this instruction.

> [W]here a person commits the murder while voluntarily intoxicated, evidence of that intoxication may be admitted "solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." Cal. Penal Code § 22(b) . . . . [Petitioner] argues that foreclosing consideration of voluntary intoxication to negate implied malice second degree murder violated his due process right to present

22

a defense and the equal protection clauses [sic] of the United States and California Constitutions. This argument, however, has been rejected. See, e.g., People v. Martin, 78 Cal. App. 4th 1107, 1114, 1117 (2000) ("It is clear that the effect of the 1995 amendment to section 22 was to preclude evidence of voluntary intoxication to negate implied malice aforethought . . . [w]e find nothing in the enactment that deprives a defendant of the ability to present a defense or relieves the People of their burden to prove every element of the crime charged beyond a reasonable doubt"); People v. Timms, 151 Cal. App. 4th 1292 (2007) (rejecting argument that section 22 violates due process and equal protection rights); accord, People v. Carlson, 200 Cal. App. 4th 695, 707-708 (2011).

[Petitioner], however, argues that these authorities misunderstand applicable authority, including Montana v. Eglehoff, [sic] 518 U.S. 37, 40 (1996). A Montana statute prohibited voluntary intoxication from being considered in determining the existence of a mental state. Four justices found that nothing in the federal due process clause precludes a state from disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Id. at 56. Justice Ginsburg concurred, but drew a distinction between a rule designed to keep out relevant, exculpatory evidence and one that redefines the mental-

23

1    state element of the offense.  Id. at 57.  The former
2    rule would violate due process; the latter would not.
3    Id.  Interpreting the statute as one redefining the
4    mens rea of the offense, Justice Ginsburg found "no
5    constitutional shoal."  Id. at 58.

6

7    Our California Supreme Court cited Eglehoff [sic] when
8    rejecting a defendant's argument "that the withholding
9    of voluntary intoxication evidence to negate the mental
10   state of arson violates his due process rights by
11   denying him the opportunity to prove he did not possess
12   the required mental state."  People v. Atkins, 25 Cal.
13   4th 76, 93 (2001).  Under Auto Equity Sales, Inc. v.
14   Superior Court, 57 Cal. 2d 450 (1962), we are bound by
15   the California Supreme Court's holdings.

16

17   (Lodgment 6 at 8-9).

18

19        **2.    The   California   Court   Of   Appeal's   Decision   That**
20             **Penal   Code   §   22(b)   Does   Not   Violate   The   Due**
21             **Process Clause Was Not Contrary To, Or An Unreasonable**
22             **Application Of, Clearly Established Federal Law**

23

24        The California Court of Appeal's analysis of Penal Code

25   § 22(b)'s constitutionality in Petitioner's case was not contrary

26   to, or an unreasonable application of, federal law as announced

27   in Montana v. Egelhoff, 518 U.S. 37, 116 S. Ct. 2013, 135 L. Ed.

28   2d 361 (1996).  In Egelhoff, the Supreme Court addressed the

constitutionality of a Montana statute providing, in relevant part, that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense." 518 U.S. at 39. In a plurality opinion, Justices Scalia, Rehnquist, Thomas and Kennedy upheld the statute on the ground a defendant's right to have a jury consider voluntary intoxication evidence in determining whether he possesses the requisite mental state for a crime is not a "fundamental principle of justice" protected under the Due Process Clause. Id. at 42-51. However, it was Justice Ginsburg who cast the deciding vote upholding the Montana statute in a concurring opinion setting forth the due process analysis that now governs statutes such as Penal Code § 22(b).[4]

According to Justice Ginsburg, the Montana statute at issue, which did not appear in the state's evidence code, "encounter[ed] no constitutional shoal" because it merely rendered evidence of voluntary intoxication irrelevant to the issue of mens rea. See Egelhoff, 518 U.S. at 58 (Ginsburg, J., concurring). Justice

---

[4] "Ordinarily, when a fragmented [Supreme] Court decides a case and no single rationale explaining the results enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." United States v. Williams, 435 F.3d 1148, 1157 (9th Cir. 2006) (quoting Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d (1977)) (internal quotation marks omitted). A court "need not find a legal opinion which the majority joined, but merely a legal standard which, when applied, will necessarily produce results with which a majority of the [Supreme] Court from that case would agree." Id. (internal quotation marks omitted). Thus, in Egelhoff, Justice Ginsburg's concurrence constitutes the holding of the case.

1    Ginsburg reasoned that while an "[evidentiary] rule designed to
2    keep out relevant, exculpatory evidence . . . offends due
3    process," Montana's law, "[c]omprehended as a measure redefining
4    <u>mens rea</u>," was constitutionally sound.  <u>Id.</u>   Thus, Montana's bar
5    on voluntary intoxication evidence, "[n]o less than adjacent
6    provisions [in Montana's code] governing duress and entrapment .
7    . . ., embodie[d] a legislative judgment regarding the
8    circumstances under which individuals may be held criminally
9    responsible for their actions."  <u>Id.</u> at 57.  In reaching this
10   conclusion, Justice Ginsburg noted that states enjoy "wide
11   latitude" to adopt such measures, and judicial review thereof is
12   limited.  <u>See id.</u> at 58 ("When a State's power to define criminal
13   conduct is challenged under the Due Process Clause, we inquire
14   only whether the law 'offends some principle of justice so rooted
15   in the traditions and conscience of our people as to be ranked as
16   fundamental.'").

17

18       Here, California's Penal Code § 22(b) suffers no
19   constitutional infirmities for the same reasons that Montana's
20   law "encounter[ed] no constitutional shoal" in <u>Egelhoff</u>.  As the
21   California Court of Appeal correctly explained in <u>People v.</u>
22   <u>Timms</u>, 151 Cal. App. 4th 1292, 60 Cal. Rptr. 3d 677 (2007),
23   "[Penal Code § 22] is part of California's history of limiting
24   the exculpatory effect of voluntary intoxication and other
25   capacity evidence."  <u>Id.</u> at 1300.  The statute appears in the
26   Penal Code, not the Evidence Code, "along with statutes defining
27   and setting forth the kinds and degrees of crimes and their
28   punishments (§§ 16-19.8), the requirements of act and intent or

negligence (§ 20), the elements of attempt (§ 21(a)), etc." <u>Id.</u>
Therefore, the manifest purpose of Penal Code § 22 is to
statutorily enshrine the policy, which dates back to 1872 in
California, that "an act is not less criminal because the actor
committed it while voluntarily intoxicated." <u>Id.</u> "Comprehended
as a measure redefining <u>mens</u> <u>rea</u>," California's law offends due
process no more than did Montana's statute in <u>Engelhoff</u>.
Accordingly, the California Court of Appeal did not act contrary
to, or unreasonably apply, clearly established federal law when
it concluded that Penal Code § 22(b) does not violate the wide
latitude California enjoys in defining the <u>mens</u> <u>rea</u> of its
criminal offenses.

    The Court notes that even if the instruction were found to
violate due process, Petitioner would not be entitled to habeas
relief because the error did not have a substantial and injurious
effect or influence in determining the jury's verdict. <u>Brecht</u>,
55 U.S. at 61-62. Even if the jury was allowed to consider
Petitioner's voluntary intoxication, it is unlikely such
consideration would have resulted in a different verdict given
the facts regarding Petitioner's attack on the victim.

\\

\\

\\

\\

\\

\\

\\

3.    The   California   Court   Of   Appeal's   Decision   That   Penal   Code   §   22(b)   Does   Not   Violate   The   Equal   Protection   Clause   Was   Not   Contrary   To,   Or   An   Unreasonable   Application   Of,   Cleary   Established   Federal   Law

Petitioner cannot establish that Penal Code § 22(b) violated his rights under the Equal Protection Clause.  Petitioner asserts that Penal Code § 22(b) accords "disparate treatment of similarly situated second degree murderers" in violation of federal equal protection.  (Petition at 4).

The California Court of Appeal rejected this contention with citations to <u>Timms</u> and <u>People v. Carlson</u>, 200 Cal. App. 4th 695, 707-08, 133 Cal. Rptr. 3d 218 (2011), which both rejected the argument that withholding a voluntary intoxication defense violates a defendant's constitutional right to equal protection. (Lodgment 6 at 8).

The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." <u>Plyler v. Doe</u>, 457 U.S. 202, 216, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982).  The Constitution does not "forbid classifications[,]" but "simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike." <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). In determining whether a statute violates the Equal Protection Clause, the first step is to identify "the proper level of

28

scrutiny to apply for review." _Honolulu Weekly, Inc. v. Harris_, 298 F.3d 1037, 1047 (9th Cir. 2002).  The Court will apply strict scrutiny if the statute "targets a suspect class or burdens the exercise of a fundamental right." _Wright v. Incline Village Gen. Improvement Dist._, 665 F.3d 1128, 1141 (9th Cir. 2011) (quoting _United States v. Hancock_, 231 F.3d 557, 565 (9th Cir. 2000)). "Laws are subject to intermediate scrutiny when they discriminate based on certain other suspect classifications, such as gender." _Kahawaiolaa v. Norton_, 386 F.3d 1271, 1277 (9th Cir. 2004) (citing _Miss. Univ. for Women v. Hogan_, 458 U.S. 718, 723-24, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982)).  However, if a state law "does not concern a suspect or semi-suspect class or a fundamental right, [the courts] apply rational basis review and simply ask whether the ordinance is rationally-related to a legitimate government interest."   _Harris_, 298 F.3d at 1047 (internal quotation marks omitted).

Here, Petitioner has not alleged discrimination based on his membership in a protected class, _see_ _Norton_, 386 F.3d at 1277 (listing race, ancestry, alienage and gender as suspect classifications), or that Penal Code § 22(b) impinges on the exercise of a fundamental right.  _See id._ (listing rights such as privacy, marriage, voting, travel and freedom of association as "fundamental").   Penal Code § 22(b) is therefore subject to rational basis review.  "Under rational basis review, the Equal Protection Clause is satisfied if: (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is apparently based rationally may

29

have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." <u>Bowers v. Whitman</u>, 671 F.3d 905, 917 (9th Cir. 2012) (quoting <u>Nordlinger</u>, 505 U.S. at 11) (internal quotation marks omitted). Penal Code § 22(b) satisfies this test.

By withholding voluntary intoxication as a defense to implied malice murder, California deters voluntary intoxication and the reckless and violent behavior associated therewith. <u>See</u> <u>Carlson</u>, 200 Cal. App. 4th at 708; <u>Timms</u>, 151 Cal. App. 4th at 1302 (stating that the law has a "deterrent effect . . . underscoring the long-standing principle in California law that voluntary intoxication is no excuse for crime"). In <u>Egelhoff</u>, the Supreme Court characterized this type of deterrent effect as "considerable justification" for state rules prohibiting jury consideration of voluntary intoxication in determining <u>mens rea</u>. <u>Egelhoff</u>, 518 U.S. at 49. Justice Scalia, writing for the plurality, explained that "[a] large number of crimes, especially violent crimes, are committed by intoxicated offenders . . . . Disallowing consideration of voluntary intoxication has the effect of increasing the punishment for all unlawful acts committed in that state, and thereby deters drunkenness or irresponsible behavior while drunk. The rule also serves as a specific deterrent, ensuring that those who prove incapable of controlling violent impulses while voluntarily intoxicated go to prison." <u>Id.</u> at 49-50. He also noted that such a rule "comports

with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences." _Id._ at 50. Given the legitimacy of California's interest in withholding the voluntary intoxication defense and Penal Code § 22(b)'s direct relationship to this interest, the California Court of Appeal's determination that Penal Code § 22(b) does not run afoul of the Equal Protection Clause was neither contrary to, nor an unreasonable application of, clearly established federal law.

However, even if Petitioner could show that Penal Code § 22(b) violated the Equal Protection (or Due Process) Clause, again, the Court finds that he cannot satisfy the _Brecht_ standard for prejudice. _See_ 507 U.S. at 637. At trial, there was only minimal evidence of Petitioner's intoxication. Martinez testified that she thought Petitioner was drunk because of how he walked, (RT 1593-94), and the CI told the police that he believed Petitioner was belligerent because he was intoxicated. (CT 122). Petitioner did not present any direct evidence that he had in fact consumed alcohol prior to attacking Cervantes or that his judgment was impaired by alcohol at the time of the homicide. However, as discussed above, there was ample evidence that Petitioner purposefully followed and attacked Cervantes with a deadly weapon with the intent to endanger Cervantes' life.

\\

\\

\\

\\

1    Consequently, barring the jury from entertaining the minimal

2  evidence of Petitioner's intoxication for purposes other than

3  assessing whether he acted with deliberation and premeditation

4  did not have a "substantial and injurious" effect on the jury's

5  verdict.   Petitioner is not entitled to habeas relief on this

6  claim.

7

8                                **VII.**

9                             **CONCLUSION**

10

11    For the foregoing reasons, IT IS ORDERED that Judgment be

12  entered denying the Petition for Writ of Habeas Corpus and

13  dismissing this action with prejudice.

14

15

16  DATED:   December 27, 2013

17                              _____/S/_____
                                SUZANNE H. SEGAL
18                              UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28